UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
_____
                                        )
PATRICIA J. REILLY,                     )
                                        )
          Plaintiff,                    )
                                        )
     v.                                 )     C.A. No. 13-785 S
                                        )
COX ENTERPRISES, INC., et al.,          )
                                        )
          Defendants.                   )
_____ )
```

**MEMORANDUM AND ORDER**

WILLIAM E. SMITH, Chief Judge.

Before the Court is Defendants' Motion for Summary Judgment ("Motion," ECF No. 43). Plaintiff filed an Opposition ("Pl.'s Opp'n," ECF No. 48) and Defendants filed a Reply ("Defs.' Reply," ECF No. 52). After careful consideration, Defendants' Motion is GRANTED for the reasons that follow.

I.  Background

Plaintiff, Patricia Reilly, is suing her former employer, CCI Corporate Services, Inc., CoxCom, LLC New England, and affiliated entities (collectively, "Cox"), and two former supervisors, Jonathan LaCroix and Mark Scott, for allegedly terminating her employment after she informed them that she planned to take a medical leave to have hip surgery, in violation of the Family Medical Leave Act ("FMLA"). Reilly also alleges gender and disability discrimination in violation of the Rhode Island Civil

Rights Act ("RICRA"), R.I. Gen. Laws § 42-112-1, and the Rhode Island Fair Employment Practices Act ("FEPA"), R.I. Gen. Laws § 28-5-1 <u>et seq.</u>

Reilly was hired by Cox in June 2004. (Defs.' Statement of Undisputed Facts ("SUF") ¶ 1, ECF No. 44.) It is undisputed that throughout her tenure she received exceptional performance reviews.[1] (<u>Id.</u> ¶ 43.) It is also undisputed that in 2006, Reilly received a written warning that cited an "ongoing pattern of Communication that [was] unprofessional" and was "leading to decreased morale and effectiveness on [her] team and within the department." (<u>Id.</u> ¶ 11-16.) In 2010, one of Reilly's direct reports, Joseph Petrucci, filed a petition in the Rhode Island Workers' Compensation Court, alleging he had suffered a "psychological/work-related acute stress disorder" caused by "repetitive harassment and verbal abuse" by Reilly (<u>id.</u> ¶¶ 28-29); however, Reilly notes that Petrucci's claim was denied, and she did not receive any written or verbal warning from Cox as a result of it. (Pl.'s Separate Statement of Undisputed Facts ("SSUF") ¶¶ 109-10, ECF No. 50.)

On July 18, 2012, Cox alleges that Reilly approached a co-worker, Dennis Hawley, and proceeded to reprimand him in a loud,

---

[1] The parties disagree, however, on the extent to which those reviews also indicated a need for improvement in Reilly's communication with her staff.

harsh, and condescending manner. (Defs.' SUF ¶¶ 44-48, ECF No. 44.) Reilly admits that a conversation occurred, but disputes that she behaved inappropriately during it. (Pl.'s Statement of Disputed Facts ("SDF") ¶ 46, ECF No. 49.) On July 28, after receiving a report from Hawley's direct supervisor, Russ O'Connor, Reilly's former supervisor, Mark Scott, referred the matter to Michelle Joseph in Cox's Human Resources ("HR") Department. (Defs.' SUF ¶ 50, ECF No. 44.) Cox's HR Department began an investigation of the incident on August 1, and Debra Cornish, Director of HR, requested a copy of Reilly's personnel file. (Id. ¶ 53.) Cornish testified at her deposition that she became involved in the investigation of the Hawley incident because "[Plaintiff] had a reputation for being abusive . . . to people," but "also had a reputation for being a very good sales person and a solid producer," so that Cornish "expected that [HR] would get resistance from the leadership team if there were any disciplinary actions taken or recommended." (Id. ¶ 51.)

Joseph began conducting interviews of Hawley and four other employee witnesses to the incident, and also began preparing a written summary of the investigation around August 7 or 8. (Id. ¶¶ 54, 56.) According to Joseph's notes, Hawley indicated in his witness statement that Reilly was "dictatorial" and that the way she had behaved was "completely inappropriate" and "not acceptable"; he also indicated that "she still does what she does"

3

because "she produces." (Id. ¶ 55.) The four other witnesses likewise described Reilly's tone during the July 18 incident as "demeaning and uncomfortable," "loud and condescending," "inappropriate," and "belittling [and] degrading." (Id. ¶¶ 57-60.) Joseph's written summary of this investigation noted, "I know Mark Scott's recommendation is Final Written Warning. I cannot see any action less than this, but I think this may warrant termination of employment." (Pl.'s SDF ¶ 61, ECF No. 49.)

On August 15, Cornish called Reilly's supervisor, Jonathan LaCroix, and informed him that "we could possibly be looking at a termination for Patricia." (Id. ¶ 64.) According to Cox, LaCroix expressed concern that Reilly's termination would have detrimental effects on Cox's business because she was such a high performer. (Defs.' SUF ¶ 64, ECF No. 44.) On August 22, Cornish and Joseph spoke with LaCroix and Scott concerning HR's investigation and recommendation. (Id. ¶¶ 68-69.) Cornish testified that "[i]t was at that meeting, or thereabouts, that we firmed up our recommendation to terminate Patricia Reilly's employment." (Pl.'s SDF, Ex. 12 [Cornish Dep.] at 69:17-19, ECF No. 49-12.) LaCroix likewise testified that "as of the 22nd, I was very aware that the recommendation coming from HR was termination, and so we were preparing documentation around [Reilly's] exit." (Id., Ex 14 [LaCroix Dep.] at 85:14-17, ECF No. 49-14.) That same day, Reilly had dinner with LaCroix, during which Reilly alleges that she told

4

LaCroix she was planning to have hip surgery, and that it was tentatively scheduled for October 4.[2]   (Id. ¶ 80.)   At his deposition, LaCroix testified that after the August 22 dinner meeting, he had discussions with most of the "major players" to inform them of Reilly's plan to have hip surgery.   (Id.)

On August 27, LaCroix's supervisor, Jeremy Bye, sent Scott an email in which he wrote that "[i]t seems that a Final Written would be the next step, but not sure of other considerations," and that he wanted to "set a call" with the "HR VP" so that they could "discuss the situation." (Id. ¶ 72; Defs.' SUF ¶ 72, ECF No. 44.) Later that day, Cox contends that Cornish had a conversation with Bye, LaCroix, and others "to discuss HR's decision to terminate Reilly." (Id.; see also Pl.'s SDF, Ex. 13 [LaCroix Interr. Resp.] at 5, ECF No. 49-13.)   The next day, Reilly alleges that she informed LaCroix that her surgery date of October 4 had been confirmed, and he in turn "informed all of the relevant decisions-makers of the surgery date." (Pl.'s SDF ¶ 81, ECF No. 49.) That afternoon, there was another conversation between HR, Bye, and others in which Reilly alleges the decision to terminate her was made. (Id. ¶ 81; see also id., Ex. 13 [LaCroix Interr. Resp.] at

---

[2] Defendants contend that Reilly merely said she was "moving in the direction" of hip surgery, but did not inform LaCroix of a specific date until August 28.

5, ECF No. 49-13.)  On August 30, Cox informed Reilly she was being discharged.  (Defs.' SUF ¶ 78, ECF No. 44.)

## II.  Discussion

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is only considered "'genuine' if it 'may reasonably be resolved in favor of either party.'"  Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997) (quoting Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994)).  When deciding a motion for summary judgment, the court must "examine[] the entire record 'in the light most flattering to the nonmovant and indulg[e] all reasonable inferences in that party's favor.'"  Id. at 959 (quoting Maldonado-Denis, 23 F.3d at 581).

### A.  FMLA Retaliation Claim

To state a claim for "retaliation" under the FMLA, a plaintiff must prove "by a preponderance of the evidence that the employer's adverse employment action was in retaliation for exercise of protected rights."  Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 332 (1st Cir. 2005); see also Pagan-Colon v. Walgreens of San Patricio, Inc., 697 F.3d 1, 8 (1st Cir. 2012) (observing that, "a crucial component of an FMLA retaliation claim is some animus or retaliatory motive on the part of the plaintiff's employer that is connected to protected conduct").  In this case,

Plaintiff claims that Cox fired her because she informed them that she would be taking a medical leave, which is protected under the FMLA.

Where a plaintiff, like Reilly, has no direct evidence that she was retaliated against for exercising her FMLA rights, the analysis of her retaliation claim proceeds under the McDonnell Douglas burden-shifting framework. See Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 160 (1st Cir. 1998). The first step of McDonnell Douglas requires Reilly to establish a prima facie case of retaliation: "(1) she availed herself of a protected FMLA right; (2) she was adversely affected by an employment decision; and (3) there was a causal connection between her protected conduct and the adverse employment action." Carrero-Ojeda v. Autoridad de Energia Electrica, 755 F.3d 711, 719 (1st Cir. 2014). If Cox articulates a non-retaliatory reason for the discharge, "the ultimate burden of proof remain[s] on the plaintiff to prove by a preponderance of the evidence that the employer's adverse employment action was in retaliation for exercise of protected rights." Colburn, 429 F.3d at 332. Alternatively, courts sometimes use a "modified version" of McDonnell Douglas, which "focus[es] instead on whether the evidence as a whole is sufficient to make out a question for a factfinder as to pretext and discriminatory animus." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 26 (1st Cir. 2004).

Cox's argument assumes, _arguendo_, that Reilly can make her _prima facie_ case of retaliation.  It focuses instead on the fact that her only evidence of pretext is the timing of her termination, and the First Circuit has held that temporal proximity alone is not enough to rebut an employer's stated non-discriminatory reason.  (_See_ Defs.' Mot. 16, ECF No. 43 (citing _Carrero-Ojeda_, 755 F.3d at 720).)  Plaintiff disagrees with this characterization of the law, and asserts that "First Circuit precedent is clear that a showing of 'very close' temporal proximity between the protected conduct and the adverse employment action, standing alone, is sufficient."  (Pl.'s Opp'n 11.)  Yet the cases cited by Plaintiff only hold that timing is sufficient to establish the causation prong of the _prima facie_ analysis; none of these cases hold that temporal proximity alone is enough to rebut a proffered non-discriminatory reason under either _McDonnell Douglas_ or the "modified framework."[3]  Indeed, in _Calero-Cerezo_, after noting that

---

[3] _See_ _Clark Cty. Sch. Dist. v. Breeden_, 532 U.S. 268, 273-74 (2001) (noting that "the cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a _prima facie_ case uniformly hold that the temporal proximity must be 'very close'"); _DeCaire v. Mukasey_, 530 F.3d 1, 19 (1st Cir. 2008) (recognizing that "temporal proximity alone can suffice to 'meet the relatively light burden of establishing a _prima facie_ case of retaliation'" (quoting _Mariani-Colon v. Dep't of Homeland Sec. ex rel. Chertoff_, 511 F.3d 216, 224 (1st Cir. 2007)); _Calero-Cerezo v. U.S. Dep't of Justice_, 355 F.3d 6, 25 (1st Cir. 2004) ("The facts demonstrate sufficient temporal proximity between the protected conduct and the employment action in this case to make out a _prima facie_ case.").

temporal proximity was sufficient to state a prima facie case, the First Circuit went on to find that "[s]ince Calero has failed to point to specific facts that would demonstrate any sham or pretext intended to cover up defendants' retaliatory motive, we will affirm the dismissal of her retaliation claim under Title VII." 355 F.3d at 26; see also Pagan-Colon, 697 F.3d at 10 (explaining that the "close temporal proximity between Pagán's FMLA-protected leave and his termination suggests a causal connection between the two," but that, "on its own is insufficient to establish pretext," and is only relevant evidence when "combined with other facts"). In Calero-Cerezo, like in this case, one of the reasons Defendants cited for firing the plaintiff was "insubordinate and disruptive behavior." 355 F.3d at 26. Accordingly, Plaintiff's evidence of temporal proximity is insufficient to establish pretext.

Plaintiff further argues that alleged inconsistencies in Cox's explanation for her termination render it "unworthy of credence." (Pl.'s Opp'n 14, ECF No. 48-1 (quoting Sabbrese v. Lowe's Home Centers, Inc., 320 F. Supp. 2d 311, 326 (W.D. Pa. 2004)).) In Sabbrese, the court found that there was a question of fact as to whether the defendant's explanation that the plaintiff was fired for pushing a co-worker in violation of company policy was "unworthy of credence" because "none of the[] management officials acknowledged that they actually made the ultimate decision to fire Sabbrese and [because of] the different views of

what actually happened — i.e., the incidental touching described by Sabbrese versus the pushing described by Lowe's." Id. at 325. Plaintiff contends that the record in this case contains similar inconsistencies. Specifically, Plaintiff cites to alleged discrepancies in the interrogatory answers of Jonathan LaCroix, Reilly's supervisor, and the deposition testimony of Debra Cornish, Director of Human Resources:

> Despite being clearly asked through interrogatories when the final decision to terminate Ms. Reilly was made and who made that decision, Mr. LaCroix provided an inconsistent and contradictory answer. He stated that the final decision to terminate Ms. Reilly was made on August 22, 2012 by Ms. Cornish and Ms. Bewlay. . . . As previously stated, Ms. Cornish testified at her deposition that she had merely made a recommendation on or about August 22, 2012 and that the final decision was made on the afternoon of August 28, 2012 [by] an undisclosed member o[r] members of a management team. It is not even clear from the record who was on the so-called management team.

(Pl.'s Opp'n 14, ECF No. 48-1.) Yet Cornish also testified that, while it was "[t]echnically" management's final decision, her "recommendation would have a significant amount of weight." (Cornish Dep. [ECF No. 49-12] at 17:20-18:2.) Even taking these facts in the light most favorable to Reilly, the fact that LaCroix characterized HR's "recommendation" as a "decision" does not amount to a material inconsistency where it is clear that management would very likely defer to that recommendation. Thus, this is different than the situation in Sabbrese, where nobody would take responsibility for the decision to fire the plaintiff.

Plaintiff also contends that she did not, in fact, yell at her coworker as alleged.  However, as Defendants note:

> The question is not whether plaintiff's or [her] fellow employees' version is the true one, but whether [the human resources officer] and [her] supervisors believed what [they] had been told by those interviewed. . . . Plaintiff's plea that [her] denials establish triable issues of fact foreclosing summary judgment would, if accepted, spell the end of summary judgment.

(Defs.' Reply 10, ECF No. 52 (quoting Ronda-Perez v. Banco Bilbao Vizcaya Argentaria-Puerto Rico, 404 F.3d 42, 45 (1st Cir. 2005)).) Here, as in Ronda-Perez, the HR Department conducted interviews with other employees, which corroborated the allegations of Plaintiff's misconduct, and "Plaintiff did not assert any adverse motive or bias on the part of any of these persons." Ronda-Perez, 404 F.3d at 45.  The only evidence Plaintiff presents to suggest that Defendants fabricated the incident with her coworker is that she, overall, had excellent reviews.  However, as Defendants note repeatedly, they do not contest this; in fact, they admit that one of Cox's hesitations in firing Reilly was her excellent performance.[4]

---

[4] Moreover, the reviews cited by Plaintiff concerning her communication skills bolster, rather than undermine, the picture Defendants paint of an employee whose harsh tone was alienating to other employees.  For example, one 2009 review stated that "Patricia has improved her approach dramatically and has been witnessed a [sic] much softer approach in dealing with employees." (Pl.'s Opp'n 17, ECF No. 48-1.)  While positive in the fact that Reilly was improving, this review also suggests that she had to be counseled concerning her tone.

Finally, Reilly argues that "Defendants failed to follow their own policy with respect to progressive discipline." (Pl.'s Opp'n 19, ECF No. 48-1.)  However, as Defendants point out, it is not the Court's role to "evaluate whether or not the discipline imposed was appropriate, or even reasonable, under the circumstances." (Defs.' Reply 11, ECF No. 52); see, e.g., Ramirez Rodriguez v. Boehringer Ingelheim Pharms., Inc., 425 F.3d 67, 81 (1st Cir. 2005) ("It is not our role to second-guess the merits of [the employer's] conclusion."); Mesnick v. Gen. Elec. Co., 950 F.2d 816, 825 (1st Cir. 1991) ("Courts may not sit as super personnel departments, assessing the merits — or even the rationality — of employers' nondiscriminatory business decisions.").  Instead, the Court must evaluate whether Plaintiff has shown that the reason given — regardless of its merit — is a pretext.  See Ramirez Rodriguez, 425 F.3d at 81 (rejecting argument that Defendant had failed to comply with progressive discipline policy).

Overall, the record consistently shows that, while undisputedly an exceptional performer, Reilly had a history of interpersonal and communication issues at work.  She cannot dispute that she received a written warning in 2006, and that in 2010, one of her direct reports filed a workers' compensation petition alleging that he had developed an acute stress disorder as a result of her incessant verbal abuse.  The fact that Cox did not take any

12

action on this complaint and that, ultimately, the employee was not awarded workers' compensation, does not prevent HR from considering it as part of a pattern.  Reilly also cannot dispute that HR investigated the July 18 incident and, notwithstanding her claim that she did nothing wrong, interviews of four different witnesses described an inappropriate outburst.

According to Reilly's version of the timeline – which the Court must credit at this stage – the final decision to terminate her was made after she told LaCroix about her planned back surgery on August 22.  Yet the evidence shows, and Reilly cannot dispute, that HR began to at least discuss termination on August 15.  (See Defs.' SUF, Ex. E [Cornish Dep.] at 63:24-64:6, ECF No. 44-5 ("[A]nd that [August 15 call] was the first time I told Jonathan that we could possibly be looking at a termination for Patricia."); Defs.' SUF, Ex. Q [LaCroix Int. Resp.] at 5, ECF No. 44-17 ("I spoke with Debra Cornish on or about August 15, 2012, about her investigation and her thoughts concerning the possibility of terminating Ms. Reilly.").)  As Cox admits, Reilly's supervisors pushed back on HR's recommendation to fire Reilly because she was a high performer and they feared their business would suffer.  That HR's recommendation ultimately carried the day does not prove any connection to Reilly's back surgery.

The bottom line is that, even viewing all the facts in Reilly's favor, the only evidence she has that her upcoming leave

13

at all factored into the decision to terminate her is the timing of that decision.  As explained above, however, temporal proximity alone is insufficient to survive summary judgment where there is a proffered non-discriminatory reason for the employer's action. Thus, there is no basis on which to find that Cox's stated reason for firing Reilly - her well-documented history of interpersonal issues and the July 18 incident - is a pretext.

    B.    FMLA Interference Claim

A plaintiff states an FMLA "interference" claim by demonstrating that she was denied substantive rights to which she was entitled under the Act.  Colburn, 429 F.3d at 331. Unlike with a retaliation claim, "no showing as to employer intent is required."  See id.  To make out an interference claim, Plaintiff must establish: (1) that she is an "eligible employee" under FMLA; (2) that she worked for an employer under FMLA; (3) that she was entitled to leave under FMLA; (4) that she gave adequate notice to her employer of her intention to take leave; and (5) that her employer denied her benefits to which she was entitled by the FMLA. Surprise v. Innovation Grp., Inc., 925 F. Supp. 2d 134, 145 (D. Mass. 2013).

In this case, Plaintiff's interference claim fails for the same reason that her retaliation claim fails: because she does not present evidence that Cox's stated reason for her termination was pretextual, she is therefore unable to prove that she was "entitled

14

to" leave under the FMLA. (See Defs.' Mot. 12, ECF No. 43.) As Defendants explain, the fact that Plaintiff requested leave does not insulate her from an otherwise legitimate firing. (See id. at 11-12); see also Carrero-Ojeda, 755 F.3d at 722 ("the FMLA does not protect an employee from discharge for any reason while she is on leave — rather, as we discussed in the retaliation context, it protects her only from discharge because she requests or takes FMLA leave"); Henry v. United Bank, 686 F.3d 50, 55 (1st Cir. 2012) ("although an employee who properly takes FMLA leave cannot be discharged for exercising a right provided by the statute, she nevertheless can be discharged for independent reasons"); Fantini v. Salem State Coll., 557 F.3d 22, 35 (1st Cir. 2009) ("There is no protection, however, for an employee who is fired for appropriate cause but also happens to be on leave.").[5]

---

[5] Defendants also argue that Plaintiff's interference claim must fail because it is duplicative of her retaliation claim. Yet courts have recognized that this type of claim is cognizable under both a theory of interference and a theory of retaliation. See Turevsky v. FixtureOne Corp., 904 F. Supp. 2d 454, 466 (E.D. Pa. 2012) ("[F]iring an employee for a valid FMLA request can constitute retaliation as well as interference."); Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 331 (1st Cir. 2005) ("The term 'interference' may, depending on the facts, cover both retaliation claims . . . and non-retaliation claims (citation omitted)). Defendants rely on this Court's decision in Warrener v. AAA of S. New England, where Plaintiff's interference claim was dismissed. Civil Action No. 14-424 S, 2015 WL 5504495, at *2-*3 (D.R.I. Sept. 16, 2015). However, in that case, Plaintiff had already taken her full 12-week leave, and therefore there was no right with which to interfere. In this case, by contrast, Plaintiff's claim is that she was entitled to her leave, but was unable to take it, due to the fact she was fired. The fact that

Accordingly, Defendants are entitled to summary judgment on Plaintiff's interference claim as well.

C.   RICRA/FEPA Gender Discrimination Claim

Plaintiff also alleges that her termination was a result of gender discrimination.  RICRA and FEPA prohibit employers from discriminating with respect to the "terms, conditions or privileges of employment" because of "race or color, religion, sex, sexual orientation, gender identity or expression, disability, age, or country of ancestral origin."  R.I. Gen. Laws § 28-5-7(1)(i)-(ii); R.I. Gen. Laws § 42-112-1.  Where there is no direct evidence, Rhode Island courts use the familiar McDonnell Douglas burden-shifting framework.  See, e.g., Neri v. Ross-Simons, Inc., 897 A.2d 42, 48 (R.I. 2006); Casey v. Town of Portsmouth, 861 A.2d 1032, 1036 (R.I. 2004).

To establish a prima facie case of sex discrimination, a plaintiff

> must show that (1) she is a member of a protected class; (2) she was performing her job at a level that rules out the possibility that she was fired for inadequate job performance; (3) she suffered an adverse job action by her employer; and (4) her employer sought a replacement for her with roughly equivalent qualifications.

Smith v. Stratus Computer, Inc., 40 F.3d 11, 15 (1st Cir. 1994).

Defendants first argue that Reilly has failed to make a prima facie

---

the theory of her retaliation claim is essentially the same, does not provide a basis for dismissal of the interference claim.

case because "[t]he evidence in the record is that Reilly was not performing her job at a level that rules out the possibility that she was fired for inadequate job performance." (Defs.' Mot. 19, ECF No. 43 (emphasis in original).)   Although Reilly's sales performance was exceptional, Defendants note the history of her inappropriate and degrading tone with other employees, including a written warning in 2006.   (Id. at 19-20.)   The Court is not persuaded on this point.   While Reilly's alleged outbursts constitute a non-discriminatory reason for firing her, based on her undisputedly exceptional performance reviews, she has shown that – at a minimum – there is a question of fact as to whether these alleged outbursts qualify as "inadequate job performance."

In any event, Plaintiff's case again fails at the rebuttal stage.   As evidence that she was fired due to her gender, she cites the following facts:

- Reilly was replaced by a male, Patrick Brunelle.

- From 2009 to 2012, of the 14 Carrier Access Managers employed by Cox, Ms. Reilly was the only female Carrier Access Manager.

- Mark Scott, Plaintiff's supervisor, and other Cox managers felt that Ms. Reilly's compensation was too high, and Mr. Scott told Ms. Reilly that her compensation was too high.

- Ms. Reilly received less compensation as a percentage of the revenue that she generated for Cox in comparison to male Carrier Access Managers.

- Mr. Scott and the other male Cox managers routinely played golf on Mondays and regularly had after-work get-togethers, yet they did not invite or include Ms. Reilly.

- Ms. Reilly had asked Mr. Scott if she could attend a Leadership Rhode Island event, and was told that there was no money in the budget for her to attend. Mr. Scott instead sent a male manager, Steve Hughes.

- There is a dispute of fact as to whether Mark Scott told Ms. Reilly about a "Book of Thongs" that contained photographs of women who worked for Cox wearing thongs.

- It is disputed whether there were multiple complaints about the way that Harvey Lee, a Sales Manager, yelled at his subordinates, yet he was simply required to take a class and was not terminated.

(Pl.'s Opp'n 22, ECF No. 48-1.)  While some of these allegations may be enough to establish a _prima facie_ case of gender discrimination, none of them successfully rebuts Cox's non-discriminatory reason for firing Reilly.  For example, the facts that Reilly was replaced by a man, that she was the only female Carrier Access Manager, and that her percentage of revenue was lower than her counterparts, help build a _prima facie_ case, but do not shed any light on why Cox's stated reason is false.  Moreover, as Defendants point out, Plaintiff's revenue allegation "is based solely on Plaintiff's own self-serving allegations and no other evidence, and therefore does not create a genuine issue of material fact." (Defs.' Reply 14, ECF No. 52.)

     As Defendants point out, a number of these allegations concern Scott, Plaintiff's former supervisor.  "[D]iscriminatory comments

may be probative of pretext if a plaintiff can 'show that discriminatory comments were made by the key decisionmaker or those in a position to influence the decisionmaker.'" Ramirez Rodriguez, 425 F.3d at 79 (quoting Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 55 (1st Cir. 2000)). However, where Defendant has a "compelling stated reason for Plaintiff's termination, . . . stray remarks [cited by Plaintiff] do not permit the inference that Defendant's real motivation for Plaintiff's discharge was [] discrimination." Id. at 79-80. As an initial matter, the record shows that Scott was one of the employees advocating that Reilly receive a written warning rather than termination. (See Pl.'s SDF ¶ 61, ECF No. 49 ("I know Mark Scott's recommendation is Final Written Warning."). But even assuming, arguendo, that Scott was a decision-maker in Plaintiff's case, his comments do not rise past the level of "stray remarks" to cast doubt on Cox's claim that Reilly was fired due to her history of interpersonal problems at work. Moreover, for some of these allegations, it is not even clear that the comment was gender-based. For example, there is no evidence that Scott's comment about Reilly's compensation being too high had anything to do with her being a woman. And finally, as Defendants note, "Reilly was unable to generate any competent evidence to support her generalized claims concerning Scott's alleged gender bias during 12 months of discovery, which included the taking of Scott's deposition." (Defs.' Mot. 25, ECF No. 43.)

The allegation that a male sales manager also yelled at his subordinates, but was not terminated, could provide strong evidence of pretext.  However, Reilly does not have any <u>evidence</u>, other than her own hearsay testimony about what she heard concerning Mr. Lee, nor does she present any facts showing that the two situations were in fact similar.  (See Pl.'s SDF, Ex. 2 [Reilly Dep.] at 224:7-13, ECF No. 49-2 ("Q. And what was Harvey Lee accused of doing? A. There were numerous complaints, to my knowledge, from people that reported to him, and he was told to take a class. Q. Now, how did you come into this knowledge? A. Some of his teammates, some of his direct reports shared that with me.")); see also Ronda-Perez, 404 F.3d at 46 (rejecting Plaintiff's argument concerning comparator where that employee "had evidenced remorse, had freely acknowledged his inappropriate behavior, was at a lower level of responsibility than plaintiff, and was free from the other criticisms levied at plaintiff").

Accordingly, the Court finds that Reilly's evidence of gender discrimination is insufficient to withstand summary judgment.

D.   RICRA/FEPA Disability Discrimination Claim

Reilly's RICRA/FEPA disability discrimination argument frames her hip surgery as a required accommodation for a disability of arthritic hips, rather than retaliation for her intention to take leave, but the crux of her argument is the same — Cox improperly terminated her because she informed them she planned to have

20

surgery. Consequently, Plaintiff's disability discrimination claim suffers the same fate as her other claims.  She again is unable to rebut Defendants' stated non-discriminatory reason for firing her.

III. Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is hereby GRANTED.

IT IS SO ORDERED.

_____
William E. Smith
Chief Judge
Date:  March 1, 2016